STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

25-556


JUSTIN FABRE, ET AL.

VERSUS

M.A. PATOUT & SON LIMITED, ET AL.



**********

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 138544
HONORABLE VINCENT J. BORNE, DISTRICT JUDGE

**********

WILBUR L. STILES
JUDGE

**********

Court composed of Elizabeth A. Pickett, Jonathan W. Perry, and Wilbur L. Stiles, Judges.




AFFIRMED.

**Andy Dupre**
**Ilijana Todorovic**
**The Dupre Law Firm, LLC**
**521 Valmont Street**
**New Orleans, LA 70115**
**(985) 855-2553**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
    **Justin Fabre**
    **Paula Fabre**
    **Bill Scully**

**Patrick Daniel**
**Patrick Daniel Law**
**4801 Woodway Drive, Suite 440-W**
**Houston, TX 77056**
**(713) 999-6666**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
    **Justin Fabre**
    **Paula Fabre**
    **Bill Scully**

**Todd A. Delcambre**
**LeBas Law Offices, APLC**
**2 Flagg Place, Suite 1**
**Lafayette, LA 70508**
**(337) 236-5500**
**COUNSEL FOR INTERVENOR/APPELLEE:**
    **American Interstate Insurance Company**

**James T. Rivera**
**Jessica W. Marchand**
**Scofield & Rivera, L.L.C.**
**100 East Vermilion, Suite 301**
**Lafayette, LA 70501**
**(337) 235-5353**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
    **M.A. Patout & Son Limited, LLC**
    **John Landry**

**Jeffrey E. McDonald**
**Treadaway Bollinger, LLC**
**406 North Florida Street, Suite 2**
**Covington, LA 70433**
**(985) 273-3123**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Louisiana Safety Consultants, Inc.**

**STILES, Judge.**

Justin Fabre sustained serious physical injury while performing construction work at a sugar processing facility. Mr. Fabre and his family members pursued a tort claim against the facility's owner as well as its project manager. The trial court, however, granted Defendants' motion for summary judgment upon a finding that no genuine issues of material fact remained as to the facility owner's status as statutory employer under the requirements of La.R.S. 23:1061. Plaintiffs appeal. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

M.A. Patout & Son Limited, LLC (Patout) operates a number of entities involved in the harvesting and processing of sugar cane, including the Jeanerette mill where the October 29, 2021 accident at issue occurred. On that date, Mr. Fabre was working on the site as an employee of Cleveland J. Billiot, III General Contracting, Inc. (Billiot), when he was called to perform work on the metal roof over the facility's fabrication area. Mr. Fabre maintained that, while performing the work, "[t]he roof gave way due to its improper maintenance, improper repair, disrepair and lack of safe means of entry and exit[.]" Mr. Fabre fell through the roof and onto the floor of the facility. He sustained injuries causing permanent paralysis.

Mr. Fabre filed this suit in February 2022 against Patout and its project manager John Landry,[1] alleging, among other things, that Defendants failed to properly maintain the premises and failed to warn of the roof's substandard condition, which led to his injury. Paula Fabre, Mr. Fabre's spouse, sought damages for loss of consortium. Billy Scully, Mr. Fabre's brother and coworker, also joined in the

---

[1] Mr. Landry is alternatively referred to as "John Laundry." We maintain the spelling used in the trial court's judgment for consistency.

petition, alleging that he witnessed the accident and now suffers psychological damage.

Patout and Mr. Landry denied liability in their answer to the petition and alternatively alleged that Mr. Fabre was a statutory employee of Patout. Defendants maintained they were therefore "immune from suit pursuant to Louisiana Workers' Compensation laws."

Defendants later filed a motion for summary judgment, asserting that Patout "is the statutory employer of Plaintiff, Justin Fabre" and, therefore, seeking dismissal of the plaintiffs' claims. Defendants maintained that it is undisputed that Billiot was Mr. Fabre's direct employer at the time of the accident and that Billiot, as the contractor, entered into an "Indemnification Agreement and Insurance Requirements" for work and services at the facility. Defendants noted that the contract specifically identified Patout as the statutory employer of Billiot and its employees. Referencing both La.R.S. 23:1061 and the Indemnification Agreement, Defendants maintained that Patout must be recognized as Mr. Fabre's statutory employer and, as such, must be further recognized as immune from liability.

Defendants supported the motion with the Indemnification Agreement signed by Billiot's president. Defendants also attached the affidavit of Patout's Chief Financial Officer wherein she stated that, on behalf of Patout, she executed the Indemnification Agreement between Patout and Billiot.

In their opposition, Plaintiffs denied that there was a statutory employment contract due to a lack of specificity therein. Moreover, even in the presence of a contract, Plaintiffs maintained that Patout would not be entitled to workers' compensation protection. Rather, Plaintiffs maintained that Mr. Fabre was instructed to perform roofing work that was outside the scope of Patout's trade, occupation, or

2

business as a sugar processor. Further, Plaintiffs maintain that genuine issues of material fact remain as to the availability of the intentional act exception to the statutory employer rule as provided by La.R.S. 23:1032(A). In part, Plaintiffs asserted that Patout sent Mr. Fabre onto the roof despite knowing of its poor condition and, moreover, Mr. Landry informed Mr. Fabre that the roof was safe and could support his weight.

Following a hearing, the trial court granted the motion for summary judgment, dismissing Plaintiffs' claims against Defendants. The trial court commemorated its ruling in an April 22, 2026 judgment by which it determined that Patout is the statutory employer of Mr. Fabre pursuant to La.R.S. 23:1061 and that Plaintiffs, in turn, failed to provide sufficient evidence to rebut the presumption of statutory employment. The trial court also determined that "no material issues of fact were raised by Plaintiff to warrant imposition of the intentional act exclusion to workers' compensation immunity." The trial court thus dismissed Plaintiffs' claims for personal injuries against Patout and Mr. Landry.[2]

Plaintiffs appeal, questioning the granting of summary judgment and the dismissal of their claims.

**DISCUSSION**

*Summary Judgment*

Louisiana Code of Civil Procedure Article 966(A)(3) provides that "[a]fter an opportunity for adequate discovery, a motion for summary judgment shall be granted if the motion, memorandum, and supporting documents show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter

---

[2] The trial court explained that Plaintiffs' claim in tort for spoliation of the evidence was not the subject of the proceeding.

of law." While the burden rests with the party moving for summary judgment, La.Code Civ.P. art. 966(D)(1) further provides that:

> Nevertheless, if the mover will not bear the burden of proof at trial on the issue that is before the court on the motion for summary judgment, the mover's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court the absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. The burden is on the adverse party to produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law.

An appellate court considers a ruling on a motion for summary judgment de novo, with the reviewing court "using the same criteria that govern the trial court's determination of whether summary judgment is appropriate -- i.e., whether there is any genuine issue of material fact, and whether the movant is entitled to summary judgment as a matter of law." *Davis v. A Bar and Grill with a Bite, Inc.*, 19-1928, p. 2 (La. 3/16/20), 294 So.3d 1051, 1052.

*Statutory Employment*

In general, the Louisiana Workers' Compensation Act provides that workers' compensation is an employee's exclusive remedy against his employer or any principal[3] for work-related injury or illness. *See* La.R.S. 23:1031; La.R.S. 23:1032. That exclusive remedy is specifically extended to statutory employers by La.R.S. 23:1061, which provides in pertinent part:

> A. (1) Subject to the provisions of Paragraphs (2) and (3) of this Subsection, when any "principal" as defined in R.S. 23:1032(A)(2), undertakes to execute any work, which is a part of his trade, business, or occupation and contracts with any person, in this Section referred to as the "contractor", for the execution by or under the contractor of the whole or any part of the work undertaken by the principal, the principal,

---

[3] Louisiana Revised Statutes 23:1032(A)(2) defines "'principal' . . . as any person who undertakes to execute any work which is a part of his trade, business, or occupation in which he was engaged at the time of the injury, or which he had contracted to perform and contracts with any person for the execution thereof."

as a statutory employer, shall be granted the exclusive remedy protections of R.S. 23:1032 and shall be liable to pay to any employee employed in the execution of the work or to his dependent, any compensation under this Chapter which he would have been liable to pay if the employee had been immediately employed by him; and where compensation is claimed from, or proceedings are taken against, the principal, then, in the application of this Chapter reference to the principal shall be substituted for reference to the employer, except that the amount of compensation shall be calculated with reference to the earnings of the employee under the employer by whom he is immediately employed. For purposes of this Section, work shall be considered part of the principal's trade, business, or occupation if it is an integral part or essential to the ability of the principal to generate the individual principal's goods, products, or services.

(2) A statutory employer relationship shall exist whenever the services or work provided by the immediate employer is contemplated by or included in a contract between the principal and any person or entity other than the employee's immediate employer.

(3) Except in those instances covered by Paragraph (2) of this Subsection, a statutory employer relationship shall not exist between the principal and the contractor's employees, whether they are direct employees or statutory employees, unless there is a written contract between the principal and a contractor which is the employee's immediate employer or his statutory employer, which recognizes the principal as a statutory employer. *When the contract recognizes a statutory employer relationship, there shall be a rebuttable presumption of a statutory employer relationship between the principal and the contractor's employees, whether direct or statutory employees. This presumption may be overcome only by showing that the work is not an integral part of or essential to the ability of the principal to generate that individual principal's goods, products, or services.*

(Emphasis added.)

An employer "bears the burden of proving entitlement to immunity." *Preston v. Southern Univ. ex rel. Bd. of Supervisors*, 20-35, p. 6 (La.App. 1 Cir. 7/13/21), 328 So.3d 1194, 1199. Further, an immunity statute, such as La.R.S. 23:1061, "must be strictly construed against the party claiming the immunity." *See Fleming v. JE Merit Constructors, Inc.*, 07-926, p. 8 (La.App. 1 Cir. 3/19/08), 985 So.2d 141, 146 (citing *Weber v. State*, 93-62 (La. 4/11/94), 635 So.2d 188).

Defendants supported their motion with Patout's October 2020 contract with Billiot, arguing that the contract established a rebuttable presumption of its statutory employer relationship with Mr. Fabre, Billiot's employee. Titled Indemnification Agreement and Insurance Requirements, the contract provides an indemnity clause for the contractor's "work/services" and includes an explicit statutory employer clause, reading:

> **NAME OF INDEPENDENT CONTRACTOR**: <u>Cleveland J. Billiot III General Contracting, Inc.</u> (hereinafter sometimes referred to as "**Contractor**").

> ## <u>INDEMNITY</u>

> IN CONSIDERATION for the use of **Contractor**'s services or work provided from time to time, **Contractor** <u>agrees to indemnify, defend, and hold harmless **Owner** for **Contractor**'s *own* negligence, fault, or other liability, whether strict liability</u> or <u>otherwise</u>. Specifically, **Contractor** agrees to indemnify, defend, and hold harmless **Owner**, its employee(s), servant(s), representative(s), agent(s), manager(s) or member(s), officer(s) or director(s), subcontractor(s), insurer(s), or invitees to **Owner's** premises, from and against any and all claims, demands, suits, causes of action and rights of action whatsoever, known or unknown, anticipated and unanticipated, which **Contractor**, its employee(s), servant(s), agent(s), representative(s), manager(s) or member(s), officer(s) or director(s), or subcontractor(s), or any person, third party, or entity may or might have, or that may accrue which are related in any way to the providing of work/services to **Owner** by **Contractor**, or to **Contractor's** presence on **Owner's** premises, and which were caused, or alleged to be caused by, <u>through, or on account of the negligence, fault or liability (strict or otherwise) of **Owner**, its employee(s)</u>, servant(s), representative(s), agent(s), manager(s) or member(s), officer(s) or director(s), subcontractor(s), other contractors or their employees, including related to the condition or maintenance of **Owner**'s premises or property, or any claimed breach of a statutory or contractual duty or obligation.

> **Owner** agrees to indemnify, defend, and hold harmless **Contractor** for **Owner's** own negligence, fault, or other liability, whether strict liability or otherwise. Specifically, Owner agrees to indemnify, defend, and hold harmless **Contractor**, its employee(s), servant(s), representative(s), agent(s), manager(s) or member(s), officer(s) or director(s), subcontractor(s) and insurer(s) from and against any and all claims, demands, suits, causes of action and rights of action whatsoever, known or unknown, anticipated and

6

unanticipated, which **Owner**, its employee(s), servant(s), agent(s), representative(s), manager(s) or member(s), officer(s) or director(s), subcontractor(s) or other contractors or their employees which are related in any way to the providing of work/services to **Owner** by **Contractor** and which were caused, or alleged to be caused, by, through, or on account of the negligence, fault, or liability (strict or otherwise) of **Owner**, its employee(s), servant(s), representative(s), agent(s), manager(s) or member(s), officer(s) or director(s), subcontractor(s), other contractors or their employees, including related to the condition or maintenance of Owner's premises or property, or any claimed breach of a statutory or contractual duty or obligation.

### OWNER IS STATUTORY EMPLOYER

**Contractor** acknowledges and agrees that the work performed or services provided by **Contractor** pursuant to this agreement is part of **Owner's** trade, business or occupation. As such, **Contractor's** work is an integral part of and essential to Owner's business and ability to generate **Owner's** goods, products and services. It is expressly understood and agreed that **Owner** is the statutory employer of **Contractor** and its employees, and that **Owner's** legal status as the statutory employer of **Contractor's** and its employees in no way effects [sic] the **Contractor's** status as an independent contractor, nor does it give **Owner** the right to direct or control the operations of **Contractor** or its employees, agents, or representatives, except as to the results to be obtained under this agreement, or consistent with the work/services.

The **Contractor** agrees to **immediately** inform **Owner** of any accident involving the **Contractor's** employees occurring on Owner's premises, or which is, in any way, related to the providing of work/services to **Owner**.

Cleveland J. Billiot, III entered into the agreement on behalf of "Contractor," Cleveland J. Billiot III General Contracting, Inc. Ashlee C. Gary signed as Chief Financial Officer for the "Owner."

Opposing the motion, Plaintiffs rejected Defendants' argument that the Indemnity Agreement establishes a prima facie showing of Patout's statutory employer status. Plaintiffs maintain that argument in this court, arguing that the Indemnification Agreement does not designate Patout as the contracting party to whom statutory employer status is conveyed, does not identify the work and services that Billiot is contracted to perform, and was signed a year before Mr. Fabre's

accident. Given the strict construction afforded immunity statutes, Plaintiffs argue, the Indemnity Agreement is insufficient to establish a prima facie case of statutory employer status. We find no merit in Plaintiffs' position.

While the Indemnification Agreement does not identify Patout by name, it references the parties as "owner" and "contractor." Ashlee C. Gary in her capacity as Chief Financial Officer accepted the agreement "for owner." To the extent the Agreement lacks precision as to the "owner's" corporate identity, Defendants submitted Ms. Gary's affidavit, wherein she stated:

> On October 30, 2020, Ashlee C. Gary, as the Chief Financial Officer for M.A. Patout & Son, Limited, LLC and on behalf of M.A. Patout & Son, Limited, LLC, executed a contract between M.A. Patout & Son Limited, LLC and Cleveland J. Billiot III General Contracting, Inc. entitled Indemnification Agreement and Insurance Requirements, which is attached hereto at Exhibit 1.

Thus, even assuming ambiguity as to the identity of the "owner," Ms. Gary's affidavit addresses that concern. *See Trent v. PPG Indus., Inc.*, 03-1068 (La.App. 3 Cir. 2/4/04), 865 So.2d 1041 (wherein this court considered affidavit(s) in clarifying an ambiguity within the context of a statutory employer agreement).

Further, while Plaintiffs challenge Patout's designation in the contract, they presented no evidence placing Patout's identity as the "owner" at issue. Nor did they present evidence of any confusion regarding the parties' identities. Rather, Plaintiffs' submission in opposition to the motion for summary judgment only confirms Patout's status as "owner." For instance, when Patout's CEO, Randall Romero, was presented with the October 30, 2020 Indemnity Agreement, he stated that it was executed by Ms. Gary on behalf of Patout. He explained that she had authority to enter into "these types of agreements" in her capacity as Patout's CFO. Billiot's status as the "contractor" named in the Indemnification Agreement is likewise clear

as the face of the agreement identifies "Cleveland J. Billiot III General Contracting Inc." as the subject "Independent Contractor." The Agreement repeats that corporate title as the "Name of the Contractor" on the signature page. Mr. Billiot accepted the agreement on behalf of the "contractor" in his capacity as "Owner/President."

Neither do we find merit in Plaintiffs' contention that the contract is unenforceable as it does not delineate the work and services that Billiot was contracted to perform. Plaintiffs' argument stems from their contention that Billiot was engaged specifically for concrete work and that the roofing work was outside of the contracted services. Plaintiffs, however, presented no evidence that Billiot's engagement was limited to the concrete work that Mr. Fabre had been engaged in before Mr. Landry directed him to repair the roof. While Mr. Fabre and Mr. Scully stated in their affidavits that Billiot was hired "to do concrete work" at Patout and that it "typically only did concrete work," they otherwise stated that Billiot "is a general contractor that specializes in limestone and concrete work."

This is in contrast to Defendants' characterization of its Indemnification Agreement as a master service agreement used for engaging general work and services. The contract's wording corroborates that broad usage, reflecting that it was extended in anticipation of "the use of Contractor's services and work provided *from time to time*[.]" (Emphasis added.) The contract subsequently refers to "the providing of work/services" as well as the commencing of "work or services[.]"

This court has recently determined that a contractor's use of a master service agreement constituted a "contract" within the context of a statutory employer defense. *Charles v. Transcon. Gas Pipeline, LLC*, 24-405 (La.App. 3 Cir. 3/12/25), 408 So.3d 491. Albeit within a case involving a two-contract theory of statutory

employment,[4] the panel rejected the plaintiff's contention that a master service agreement failed to satisfy the contractual element of La.R.S. 23:1061 as the agreement did not define the particular work that a contractor, Tucker, hired its subcontractor, Blue Fin, to perform. *Id.* The plaintiff also argued that the MSA did not bind Blue Fin to actually perform work. *Id.* The panel explained Tucker and Blue Fin executed the MSA "to be a standing agreement between Tucker and Blue Fin governing work to be performed in the future by Blue Fin for Tucker." *Id.* at 497. The panel specifically rejected the plaintiff's contention that additional documentation was required to identify "who, what, when, and price" as the master service agreement broadly provided the contractor "*regularly and customarily* enters into contracts with companies and individuals to perform *work and/or provide services*, equipment, machinery, materials or supplies, all of which is defined to be the Work[.]" *Id.* at 498. (Emphasis added.) This anticipatory, but non-specific language, echoes the Indemnification Agreement's reference to the use of Billiot's "services or work *provided from time to time*[,]" as consideration for Billiot's indemnification of Patout.

While Plaintiffs argue that genuine issues of material fact remain regarding whether the October 2020 Indemnification Agreement could have "even applied" to the October 2021 accident, the reasoning of *Charles* undermines that position. In that case, the master service agreement was executed well over one year before the plaintiff was injured. The panel explained that the subject "standing agreement" was

---

[4] The two-contract theory of statutory employment "applies when (1) the principal enters into a contract with a third party; (2) pursuant to that contract, work must be performed; and (3) in order for the principal to fulfill its contractual obligation to perform the work, the principal enters into a subcontract for all or part of the work performed." *McBride v. Old Republic Ins. Co.*, 24-1519, p. 9 (La. 6/27/25), 413 So.3d 452, 463 n. 12.

similar to one discussed in *Allen v. State ex rel. Ernest N. Morial-New Orleans Exhibition Hall Authority*, 02-1072, p. 13 (La. 4/9/03), 842 So.2d 373, 382, wherein the supreme court reasoned that:

> [N]o reason has been advanced, nor can we fathom one, to support a finding that a principal who has a long-standing agreement with a supplier to provide labor and/or services in connection with jobs for which the principal contracts should be treated differently, for the purposes of the compensation obligation, than one who enters separate contracts with the supplier after first contracting with a third party to perform certain work.

*Charles*, 408 So.3d at 498.

While the panels in both *Charles* and *Allen* considered the subject master service agreements within the context of defendants seeking a two-contract statutory employer defense, we find the reasoning applicable in this case where Patout and Billiot anticipated non-specific work that could arise from time to time.

And, far from rebutting Patout's prima facia showing, Plaintiffs' opposition to the motion for summary judgment again indicates that the Indemnification Agreement encompasses Billiot's provision of various trades. CEO Romero, for instance, explained that the Indemnity Agreement is used for all companies that work on Patout's premises. He denied that it was related to a specific project and testified that it applies to all projects that the contractor may do at the facility. Mr. Romero explained that, with regard to Billiot, the contractor was asked to perform various services on an as-needed basis. In this particular instance, the "job was on time and materials," and not based on a specific bid.

Finally, we find no merit in Plaintiffs' alternative argument that their submission demonstrated the existence of genuine issues of material fact as to whether Mr. Fabre's work at the Patout facility was an "integral part" of Patout's ability to manufacture raw sugar products. Louisiana Revised Statutes 23:1061(A)(1)

states that "work shall be considered part of the principal's trade, business, or occupation if it is an integral part *or essential to the ability of the principal to generate the individual principal's goods, products, or services.*" (Emphasis added.) As seen by reference above, the Indemnification Agreement signed by Billiot tracks this language of the statute.

Importantly, the legislature revised La.R.S. 23:1061 in 1997 to include the latter scope of work as well, i.e., whether it is essential to the ability of the principal to generate its goods, products, or services. Specific to the type of work at issue in this case, jurisprudence reflects a finding that construction or repair of a business's facility is essential to its ability to produce its products. For instance, the fourth circuit remarked that "'[w]ithout a building or facility, it would be virtually impossible for Gulf Liquids to process the chemicals and produce its products for transportation and sale . . . ." *See Lopez v. U.S. Sprint Commc'ns Co.*, 07-52, p. 10 (La.App. 4 Cir. 12/5/07), 973 So.2d 819, 826 (quoting *Jackson v. St. Paul Ins. Co.*, 04-26, p. 8 (La.App. 1 Cir. 12/17/04), 897 So.2d 684, 689, *writ denied*, 05-156 (La. 3/24/05), 896 So.2d 1042), Therefore, "the construction of the new fractionation plant was part of Gulf Liquids' 'trade, business, or occupation,' and qualified Gulf Liquids as a statutory employer entitled to the exclusive remedy protections of La.R.S. 23:1032 . . . .'" *Id.* at 826—27 (quoting *Jackson*, 897 So.2d at 689). *See also Duncan v. Dow Pipeline Co.*, 06-1455 (La.App. 3 Cir. 3/7/07), 952 So.2d 884 (a contractor's repairs to the flooring of a pipeline company's platform constituted an integral part of the company's business as it allowed the company to operate and maintain safe pipelines essential to its smooth and continued business of manufacturing oil products); *Trent*, 865 So.2d 1041 (the installation of a foundation and structural steel for a pipeline was essential to a refinery's ability to generate its

goods, products, or services); and *Applegarth v. Transamerican Ref. Corp.*, 00-1547 (La.App. 5 Cir. 2/28/01), 781 So.2d 804 (construction of a retaining wall and pipe racks for a pipeline was essential for the project owner's ability to generate its goods, products, or services), *writ denied*, 01-834 (La. 5/11/01), 792 So.2d 738.

The reasoning of those cases negates Plaintiffs' contention that it established genuine issues of material fact regarding whether Billiot's repair work was an integral part of or essential to Patout's business. Excerpting Mr. Romero's deposition, Plaintiffs point out the CEO denied that the roof had been repaired or replaced for decades, denied that its operations were shut down while the roofing repairs were underway, and denied that roofing repair was part of its business. Those statements, however, are immaterial to whether Billiot's work, and in turn Fabre's work, was "*essential to the ability of [Patout] to generate [Patout's] goods, products, or services*" as required by La.R.S. 23:1061(A)(1). (Emphasis added.) Just as it would be "virtually impossible" for a principal to process and produce its products "[w]ithout a building or facility," it would be similarly impossible for Patout to maintain its sugar cane processing without a roof overhead. *See Lopez*, 973 So.2d at 826 (quoting *Jackson*, 897 So.2d at 689). Mr. Romero confirmed in his deposition that the roofing under repair covered the fabrication area and that a leak from the roof was of concern due to the installation of new equipment. Under Plaintiffs' reasoning, Patout's statutory employer defense would require its facilities to have degraded to the point that it would have to cease operations in order to seek the needed renovation. Neither La.R.S. 23:1061 nor jurisprudence requires that point of neglect.

This assignment of error lacks merit.

*Intentional Act*

Finally, Plaintiffs alternatively argue that the circumstances of Patout sending Mr. Fabre onto the faulty roof raise genuine issues of material fact as to whether Mr. Fabre's fall was substantially certain to occur. Plaintiffs contend that their claim falls under the intentional act exception to the exclusive remedy for a work-related injury. *See* La.R.S. 23:1032(B) ("Nothing in this Chapter shall affect the liability of the employer, or any officer, director, stockholder, partner, or employee of such employer or principal to a fine or penalty under any other statute or the liability, civil or criminal, resulting from an intentional act.").

In particular, Plaintiffs reference Mr. Fabre's affidavit where he explained, among other things, that he was employed by Billiot, that Billiot was a general contractor, that Billiot specialized in limestone and concrete work, and that he only performed concrete work for Billiot. When Mr. Landry told him that he was "going up to the roof to fix it," Mr. Fabre responded that they did not have roofing experience and that he had not worked in roofing or roofing safety. When he challenged Mr. Landry regarding the safety of the assignment, Mr. Landry told him to "go up there, and pointed to the roof, or go home." Mr. Landry assured the men that it was safe. Mr. Fabre explained that, once on the roof, he did not see any areas immediately near him with holes and that, as he had been assured that walking on the roof was safe, he "took a step on what [he] believed was a solid area that was safe . . . and fell through." Mr. Scully stated similarly in his affidavit.

Plaintiffs also presented the affidavit of Leonard Quick, a licensed professional engineer who stated that roofing work in Louisiana requires a license, specialized training, and OSHA training specific to roofing work. Mr. Quick opined that Patout lacked these qualifications, had a history of disregard for its facility, and

14

that the facility was in a state of disrepair. Mr. Quick concluded that Mr. Fabre was "placed in a position where he was expected to fail," was informed that he was subject to the termination of his employment if "he did not do something he knew to be dangerous[,]" and "that his superior knew to be dangerous and life threating." Mr. Quick opined that that it was "substantially certain" that the roof could not hold Mr. Fabre's weight, that he could not walk safely on the roof, and that he would fall and be injured or die. Mr. Quick surmised in conclusion that "[i]t was substantially certain that Justin Fabre would not go to this roof and ever return safely without accident or injury given his lack of training, experience, expertise, fear o[f] heights, licensing and the roof's vast deterioration beyond its useful life which was all known" by Patout.

Plaintiffs also presented a report from Michael Wright, a professional engineering consultant, who offered his opinion that Patout failed to adhere to various safety responsibilities. He concluded that Patout's failure to exercise reasonable care was a direct cause of Mr. Fabre's accident and injuries. Given his conclusion that Patout had knowledge of the substandard "roof decking conditions," Mr. Wright stated that it was certain that the condition would cause injury, and that Patout "willfully disregarded the risk of harm which was a direct and proximate cause of Plaintiff Justin Fabre's injury and nearly dying." Plaintiffs suggest that Mr. Fabre's affidavit, along with the experts' opinions, "at the very least creates a genuine factual issue on the question of substantial certainty that should proceed to the jury."

Even construing Plaintiffs' factual allegations in their favor, however, the Plaintiffs have not met the substantial certainty standard. Notably, in *Reeves v. Structural Preservation Systems*, 98-1795, p. 9 (La. 3/12/99), 731 So.2d 208, 212,

the supreme court explained that: "Believing that someone may, or even probably will, eventually get hurt if a workplace practice is continued does not rise to the level of an intentional act, but instead falls within the range of negligent acts that are covered by workers' compensation." The court further stated,

> The traditional definition is simply a way of relieving the claimant of the difficulty of trying to establish subjective state of mind (desiring the consequences) if he can show *substantial certainty* that the consequences will follow the act. The latter takes the case out of the realm of possibility or risk (which are negligence terms), and expresses the concept that an actor with such certainty cannot be believed if he knew the consequences would follow. In human experience, we know that specific consequences are substantially certain to follow some acts. If the actor throws a bomb into an office occupied by two persons, but swears that he only "intended" to hurt one of them, we must conclude that he is nonetheless guilty of an intentional tort as to the other, since he knows to a virtual certainty that harmful consequences will follow his conduct, regardless of his subjective desire.

Malone & Johnson, *Civil Law Treatise, Volume 14, Workers' Compensation Law & Practice,* § 365, p. 208.

> "'Substantially certain to follow' requires more than a reasonable probability that an injury will occur and 'certain' has been defined to mean 'inevitable' or 'incapable of failing.'" *Jasmin v. HNV Cent. Riverfront Corp.*, *supra* at 312. "[A]n employer's mere knowledge that a machine is dangerous and that its use creates a high probability that someone will eventually be injured is not sufficient to meet the 'substantial certainty' requirement." *Armstead v. Schwegmann Giant Super Markets, Inc.*, 618 So.2d 1140, 1142 (La.App. 4 Cir. 1993), *writ denied*, 629 So.2d 347 (La.1993). "Further, mere knowledge and appreciation of a risk does not constitute intent, nor does reckless or wanton conduct by an employer constitute intentional wrongdoing." *Id.* (citing *Tapia v. Schwegmann Giant Supermarkets, Inc.*, 590 So.2d 806, 807-808 (La.App. 4 Cir. 1991).

*Id.* at 212-13. *See also White v. Monsanto Co.*, 585 So.2d 1205 (La.1991); *Bazley v. Tortorich*, 397 So.2d 475 (La.1981).

While Plaintiffs argue that Defendants were required to "show a complete absence of any factual dispute regarding whether they knew that this incident was

16

substantially certain to follow from their conducts," it is the plaintiff who bears the burden of proving that the work-related injury resulted from an intentional act. *See Hoffman v. Target Corp. of Minnesota*, 06-1067 (La.App. 3 Cir. 2/14/07), 951 So.2d 1290, *writ denied*, 07-550 (La. 5/4/07), 956 So.2d 614. *See also Marino v. Boh Bros. Constr. Co., L.L.C.*, 07-1090 (La.App. 4 Cir. 4/2/08), 982 So.2d 887, *writ denied*, 08-934 (La. 6/20/08), 983 So.2d 1283. Therefore, in this summary judgment proceeding, Defendants were required only to point out the absence of factual support for one or more elements essential to Plaintiffs' claim. *See* La.Code Civ.P. art. 966(D)(1). In turn, Plaintiffs were required to produce *factual* support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law. *Id.* In this case, Plaintiffs have not done so.

Plainly, Patout knew of the roof's aged condition, hence the need for repair due to leaking. Plaintiffs also demonstrated that Mr. Fabre denied having any roofing expertise and that Patout, through Mr. Landry, sent Mr. Fabre onto the roof for the repair over Mr. Fabre's protestations. Further, Mr. Quick and Mr. Wright identified various safety breaches associated with Mr. Fabre's assignment. And finally, Mr. Fabre did in fact sustain serious injury. However, those facts, individually or collectively, do not indicate that Mr. Fabre's injuries were substantially certain to occur. Recall that a high probability of injury is insufficient under the standard. *See Bazley*, 397 So.2d 475. Even violation of safety standards and disregard of known safety risks that may constitute gross negligence do not constitute an intentional act or meet the substantial certainty test. *Reeves*, 731 So.2d 208. Thus, even assuming that Patout knowingly sent an untrained worker onto the roof, such negligent or grossly negligent conduct as alleged did not rise to the level of an intentional act.

17

Finally, Mr. Quick and Mr. Wright opined on the issue of whether Mr. Fabre's injuries were substantially certain. While La.Code Civ.P. art. 967 does not preclude the use of affidavits of qualified expert witnesses in support of or in opposition to a motion for summary judgment, the provision instructs that the affidavits "may set forth such experts' opinions *on the facts* as would be admissible in evidence . . . ." *See also* La.Code Civ.P. art. 966(D)(1) (requiring Plaintiffs to come forward with *factual support*). As stated above, Plaintiffs did not come forward with sufficient facts to meet the substantial certainty test. Those same circumstances, accompanied by allegations of negligent and grossly negligent performance of safety regulations, underpin the experts' conclusory opinions on the ultimate issue of substantial certainty. Those underlying facts simply do not rise to the level of an intentional act. Accordingly, we find that the trial court appropriately entered summary judgment in favor of Defendants.

This assignment of error lacks merit.

### DECREE

For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this proceeding are assessed to Plaintiffs/Appellants Justin Fabre, Paula Fabre, and Bill Scully.

**AFFIRMED.**